## IN THE UNTIED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| DAVID L. ROBINSON, | ) | |
| | ) | NO. 2:04-0067 |
| Petitioner, | ) | JUDGE HAYNES |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID MILLS, Warden | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM

Petitioner, David L. Robinson, filed this action under 28 U.S.C. § 2254, seeking to set aside his state conviction for first degree murder for which Petitioner received a life sentence. After a review of the pro se petition, the Court appointed the Federal Public Defender, who filed an amended petition. (Docket Entry No. 8). The Court also granted discovery and Petitioner's motions to expand the record. (Docket Entry Nos. 10, 31, 34, 35 and 74). Respondent filed the state court records on Petitioner's state proceedings. (Docket Entry No. 21, Addenda 1 through 5 and Docket Entry No. 53).

In his amended petition, Petitioner asserted the following claims: (1) that his trial counsel provided ineffective assistance in violation of the Sixth and Fourteenth Amendments arising from their failures to interview two witnesses about the murder victim's threats, to seek a severance from his co-defendant and to object to the racial composition of the Petitioner's jury; (2) that the trial court's rulings violated Petitioner's Sixth and Fourteenth Amendment rights to confront state witnesses by restricting Petitioner's counsel's cross examination of state witnesses; (3) that the trial court violated Petitioner's due process rights by admitting evidence of Petitioner's girlfriend aborting Petitioner's child as well as a case agent's narrative and opinion

about the shooting of the victim; and (4) that the State violated Petitioner's rights under Brady[1] by failing to disclose that a key state witness and eye witness to the murder was actually a paid state informant and also by withholding a portion of another witness's second recorded statement that tended to support Petitioner's trial defense of self-defense.

After additional proceedings, Petitioner conceded that due to procedural defaults and other issues, he now pursues only his two Brady claims and his Sixth Amendment claim for the trial court's restriction of his counsel's cross-examination of Jacqueline Langford, a state witness. (Docket Entry No. 80, Petitioner's Motion for Summary Judgment at p. 1).

## A. Procedural History

Petitioner was indicted with Deloris Smith for the first degree murder of Gerald Irwin on January 13, 1995 in Putnam County, Tennessee arising out of a drug debt Petitioner owed to Irwin, a drug dealer. After a jury trial, Petitioner was convicted, but he appealed. On his direct appeal, Petitioner asserted several claims, including the trial court's restriction of his defense counsel's cross-examination of Jacqueline Langford. State v. Robinson, 1999 WL 61062 at *3 (Tenn. Ct. Crim. App. Feb. 10, 1999). The Tennessee Supreme Court denied his application for permission to appeal. Id.

Petitioner then filed his state post-conviction petition, asserting among his claims that the State failed to disclose its agents' second interview of James Rice, who submitted an affidavit supporting Petitioner's contention that the victim threatened to kill the person that owed the victim a drug debt, i.e., Petitioner. In his state post-conviction petition, Petitioner also alleged his belief that Kim Sims, a State witness, was a paid state informant. (Docket Entry No. 21,

─────────────────

[1]Brady v. Maryland, 373 U.S. 83 (1963).

Addendum No. 11 at p. 18). The trial court denied the petition and found that Rice's affidavit was inadmissible given Rice's death and that even if admissible, the contrary testimony of the key agent that there was only one taped interview was more credible. The allegation of Sims as a State informant was not developed by the parties nor addressed by the state courts. On appeal, the Tennessee Court of Criminal Appeals affirmed. Robinson v. State, 2003 WL 22888916 (Tenn. Ct. Crim. App. Dec 5, 2003). The Tennessee Supreme Court denied Petitioner's application to appeal. Id.

## B. Review of the State Court Record

### 1. State Court's Factual Findings

As to the facts underlying Petitioner's conviction, the Tennessee Court of Criminal Appeals found[2] as follows:

> Appellants [Petitioner and Deloris Smith] were indicted for the first degree murder of Gerald L. Irwin in Putnam County. During the evening of January 12, 1995 and early morning hours of January 13, the victim contacted appellant Robinson several times about the payment of a $200 debt that Robinson owed him. Robinson met with the victim, a known drug dealer, on two occasions that night, but denied having the money to pay the debt. Finally, Robinson called the victim and said that he had the money and expressed his desire to meet the victim. The victim suggested that they meet at the "old oak tree" in Cookeville.
>
> Evidence showed that Robinson resold drugs that he obtained from the victim and, specifically, that he sold drugs to appellant Smith and had done so for approximately one year. Smith was at the Robinson residence to purchase drugs on the night of January 12, 1995. Although she did not know the details, Smith was aware that someone was trying to collect money from Robinson. In conjunction with that, Smith had driven Robinson to a pay phone to make phone calls that evening. She was also present at the Robinson home when the victim called and suggested the meeting at the oak tree. Smith agreed to take Robinson

---

[2] State appellate court opinion findings can constitute factual findings under 28 U.S.C. § 2254(d) with a statutory presumption of correctness. Sumner v. Mata, 449 U.S. 539, 546-47 (1981).

there.

Smith drove Robinson to the old oak tree and they waited for the victim to arrive. Robinson was in possession of a small handgun that Smith had provided. FN1 As the victim approached, Robinson exited the vehicle and told Smith to drive around and then come back and get him. Robinson got into the backseat of the victim's car. Kim Sims was a passenger in the front seat. The victim drove a short distance and pulled into a parking lot to turn around. As the victim turned his car, Robinson shot him in the back of the head. Robinson then told Kim Sims to move to the backseat. Robinson got in the driver's seat and pushed the victim's body over so that he could drive the car. As Robinson drove the victim's vehicle past Smith's vehicle, he motioned for her to follow him.

> FN1 In her statement to the police, Smith said that she had given
> Robinson the gun earlier that evening when he made the statement,
> "I need a gun."

They drove on Interstate 40 to the Smithville exit where Robinson pulled off and parked the victim's car on Tucker Ridge Road. He took the victim's wallet, cellular phone, pager, money, and some drugs. He and Sims got into the Smith vehicle and they returned to Cookeville. Robinson, Smith, and Sims concocted a "story" regarding their activities that evening. The day following the shooting, Robinson called the victim's friends and family inquiring about his whereabouts, apparently in an attempt to divert any suspicion.

According to Sims' testimony, she spent part of the day pretending to be looking for the victim and asking others about his whereabouts, likewise in an effort to divert suspicion from her. Both Sims and Smith gave statements to law enforcement officials that corroborated the concocted story. Those statements were later recanted and both gave new statements to law enforcement officials.

Robinson testified at the trial and denied having any intent to kill the victim. He claimed that he shot the victim in self-defense. Robinson said that the victim had threatened him and his family over the course of the night and he shot the victim because the victim pointed a gun at him while in the car. Although she did supply the gun, Robinson stated that Smith had nothing to do with the murder and did not know anything about it. The State theorized, however, that Robinson and Smith planned the murder and both were involved. **Although certain details were corroborated by a number of other witnesses, the State's theory was established principally by Kim Sims, the only eyewitness to the crime. Sims testified that she did not see the victim reach for his gun, and although she had been with the victim several hours that night, she never heard him threaten Robinson.**

4

Smith did not testify at trial, but her second statement to law enforcement officials corroborated Robinson's testimony that he was fearful of the victim. In her statement, Smith denied any involvement in the murder, but admitted giving the weapon to Robinson. The jury convicted Robinson of the first degree murder of Irwin. Under a theory of criminal responsibility, Smith was convicted of the lesser offense of second degree murder.

Robinson, 1999 WL 61062 at **1, 2 (emphasis added).

In rejecting Petitioner's state post-conviction petition, the Tennessee Court of Criminal

Appeals made additional findings that are pertinent to his claims in this action as follows:

At the evidentiary hearing, one of the petitioner's trial attorney's testified that he had practiced law for almost thirty-four years in Putnam County and that he had tried several criminal cases. . . . He said that the district attorney's office had an open file policy in this case and that a man named James Rice gave a statement to Tennessee Bureau of Investigation (TBI) Agent Larry O'Rear. He said that his co-counsel got audiotaped and transcribed copies of Mr. Rice's statement and that co-counsel wanted to interview Mr. Rice but could not find him. He said that the state had issued a subpoena for Mr. Rice but that the subpoena was returned because Mr. Rice could not be located. He said that although Mr. Rice's taped statement seemed to end abruptly, Agent O'Rear assured him the audiotape contained Mr. Rice's entire statement.

\* \* \*

The petitioner's co-counsel testified that . . . the defense tried to find James Rice before trial, that he had copies of the statement Mr. Rice gave to Agent O'Rear, and that he talked to Nicole Rice but she would not testify. He said that Mr. Rice had prior convictions for forgery and possession of stolen property, that Mr. Rice probably was taking drugs on the night of the victim's death, and that Mr. Rice would have had to have damaging testimony for the state's case in order for the defense to call him as a witness.

\* \* \*

The petitioner testified that . . . he did not know James Rice but that Mr. Rice contacted his father after the trial and wanted to know why no one had interviewed Mr. Rice or asked him to testify. He said that his father never had trouble finding Mr. Rice and that his father had Mr. Rice give an affidavit. He said that if Mr. Rice had testified at trial, the outcome of his case would have been

different....

On cross-examination, the petitioner acknowledged that. . . he did not know Mr. Rice's name had been on the state's witness list, that a subpoena had been issued for Mr. Rice, or that the subpoena had been returned because Mr. Rice could not be found....

TBI Special Agent Larry O'Rear testified that he interviewed James Rice once and that Mr. Rice's entire statement was tape recorded and transcribed. On cross-examination, he said that he was unaware of anyone else interviewing Mr. Rice and that Mr. Rice gave only one statement.

The state told the trial court that James Rice was deceased. Although the petitioner had attached James Rice's affidavit to his petition for post-conviction relief, the trial court stated that it could not admit the affidavit into evidence because Mr. Rice was unavailable for cross-examination. In Mr. Rice's affidavit, which he gave after the petitioner's trial, Mr. Rice claimed that he made two statements to Agent Larry O'Rear. In addition, he claimed that on the night the petitioner shot the victim, he heard the victim say that the victim was going to kill someone if the victim was not repaid a debt.

In denying the petitioner's petition for post-conviction relief, the trial court. . . stated that even if it could consider Mr. Rice's affidavit as evidence, the affidavit would not warrant post-conviction relief because the trial court believed Agent O'Rear's testimony over the information contained in the affidavit.

Robinson v. State, 2003 WL 22888916 at **1, 2, 3-4.

## 2. The Cross-Examination of Jacqueline Langford

Jacqueline Langford, the mother of Petitioner's children and a State witness, testified on direct examination about her understanding of a statement made about the Irwin murder by Deloris Smith, Petitioner's co-defendant. In this direct examination, Langford described events at her residence the morning after the murder:

Q.     Did you see Ms. Smith again?

A.     Yes.

Q.     Where.

6

A.   She came to my house.

Q.   At what time was that?

A.   I don't know.  I guess it was around 9:00 or 10:00.  I'm not sure.

Q.   Did you and she talk.

A.   Yes.

Q.   Do you recall what it was that she had to say or to ask?

A.   She asked where Pookie was.

Q.   Is "Pookie" David Lee Robinson, Jr.?

A.   Yes

Q.   Did you answer her?

A.   Yes.

Q.   What did you tell her?

A.   Where he had gone, where he had told me he had gone to.

Q.   And what was that?

A.   He went to give Kim a ride back to Sparta.

Q.   And what did Ms. Smith say in response to that.

A.   She seemed to get nervous, upset.

Q.   **At that point, Ms. Langford did Ms. Smith make any statement to you about the shooting?**

A.   **I thought she said that he was supposed to kill her too.  I'm not sure; I thought that's what she said.**

(Docket Entry No. 21, Addendum 3b at pp. 519-520) (emphasis added).

Petitioner's counsel's cross-examination of Langford, including objections and the trial court's rulings, was as follows:

Q.  Okay. Now, Deloris came and went to your house several times, didn't she?

A.  Yes.

Q.  That morning. Is that right?

A.  Yes.

**Q.  And you did get a phone call and David said he was going to get, Mr. Robinson said he was going to go get Kim Sims. Is that right?**

**A.  Yes.**

**Q.  And Deloris came back at that time, didn't she?**

**A.  Yes.**

**Q.  And you were talking to her, right?**

**A.  Yes.**

**Q.  And, now, you say in here that she said he was supposed to kill her too. Is that right?**

**A.  I said I think that's what she said.**

**Q.  Under oath today, can you swear that's what she said?**

**A.  No. I think that's what she said.**

**Q.  You think that's what she said. Could she have said he could have killed them both?**

GEN. CHRISTIANSEN: If Your Honor, please, I respectfully object on what could have.

THE COURT: **Sustained.**

MR. CHAFFIN: Your Honor, I think I have a right to go in and ask her.

THE COURT: **You can ask her, but that question was improper. Sustain the objection.**

Q.     You're under oath today, right?

A.     Uh huh.

Q.     **You cannot swear that's what she said, can you?**

GEN. CHRISTIANSEN: **If Your Honor, please, that's repetitious.**

MR. CHAFFIN:     Well, I'd like to be able – (interrupted).

THE COURT: **Sustain the objection.**

GEN. CHRISTIANSEN:     At this time, sir, I ask the Court to give the jury a limiting instruction.

THE COURT: **She's already answered.**

MR. CHAFFIN:     Your Honor, I'd like to take up something out of the presence of the jury, please.

THE COURT:     You can cross-examine.

Q.     Ms. Langford, you were scared when Deloris was in that room, weren't you?

A.     Yes.

Q.     You were scared when Deloris was talking to you.

A.     Yes.

Q.     You didn't want to hear all of this, did you?

A.     No.

Q.     You were afraid of what's going on, weren't you?

A.     Yes.

Q.     And later on that day, David Robinson gave you an animal cracker box. Is that right?

A.     Yes.

Q.     And it had that money in it, right?

A.     Yes.

Q.     And it had those drugs in it too, didn't it?

A.     I didn't know.

Q.     You didn't know? You didn't look in the box. He just gave it to you, right?

A.     Yes.

Q.     Didn't say anything, did he?

A.     No.

Q.     You didn't know that he had anything, did you?

A.     No.

Q.     Did you?

A.     No.

Q.     He didn't have to give that to you, did he?

A.     No.

Q.     You didn't tell him to give it to you, did you?

A.     No.

Q.     Didn't even know he had it. Is that right?

| | |
|---|---|
| A. | Right. |
| Q. | Okay. Then after he got out, a little later on, did Mr. Robinson make a statement to you that this was self defense. |
| A. | That he did what he had to do. |
| Q. | **Okay. Did he tell you it was self-defense?** |
| A. | **No.** |
| Q. | **Just said he had to do what he had to do.** |
| A. | **Yes.** |

MR. CHAFFIN:   Okay. That's all.

(Docket Entry No. 21, Addendum No. 3d at pp. 531-534) (emphasis added).

In support of Petitioner's motion for a new trial, Langford submitted her affidavit that reads, in pertinent part, as follows:

> 3. That she did not get to explain that she did not remember what Deloris Smith
>
> exact words were, if she said he might, could have or may kill Gerald Irwin **or he**
>
> **had to kill Gerald.**

(Docket Entry No. 21, Addendum No. 1 at p. 129) (the emboldened portion is Langford's handwritten addition to the affidavit).

### 3. The Disputed Second Taped Interview Of James Rice[3]

For his <u>Brady</u> claim about James Rice, Petitioner contends that the State failed to produce a second taped statement of Rice who submitted an affidavit that he gave two taped interviews to

---

[3]This Court held an evidentiary hearing on Petitioner's proof to show cause and prejudice for the procedural defaults of his two <u>Brady</u> claims involving Rice and Sims.

the investigating officers about the victim's threats to Petitioner the night before the murder. At one point in the investigation of the murder, Sims identified James Rice as a suspect in the murder of Gerald Irwin. Id. at Addendum No. 1 at pp. 138-139. Sims and Gerald Irwin had visited the Rice residence on the night before the murder.

As to the interview(s) of James Rice, the trial record reflects that, after advising him of his Miranda rights, Agent O'Rear interviewed Rice about the murder, initially at Rice's residence, and later in a recorded interview at the Putnam County Sheriff's Office.

> **Q.** **Mr. O'Rear, did you go down to the Rices' house-hold and have a conversation with them?**
>
> **A.** **Yes, I did.**
>
> **Q.** **And that was an interview that was taped. Is that right?**
>
> **A.** **No, sir.**
>
> **Q.** **It was not taped?**
>
> **A.** **No, sir.**
>
> **Q.** **Okay. Did they come to your office or somewhere at one time and make you a tape of their conversation?**
>
> **A.** **Yes, sir, they came to the Putnam County sheriff's office and a taped conversation was - - (Interrupted)**
>
> **Q.** And I think the date of James Ray Rice's conversation is 1/13/95. It that correct?
>
> **A.** That is correct, yes sir, at 9:10 p.m.

(Docket Entry No. 21, Addendum No. 3 at pp. 218-19) (emphasis added).

At the state post-conviction hearing, O'Rear testified that he conducted only one

12

interview of Rice.

> Q. I'll call your attention to your interview with James Rice. Do you recall that interview?
>
> A. Yes, I do.
>
> Q. **Did you interview [Rice] on one occasion or more than one occasion?**
>
> A. **I interviewed him on one occasion.**
>
> Q. Have you reviewed the tape and compared it with the transcript that was provided to the defense in this proceeding?
>
> A. Yes, I did, as late as yesterday afternoon.
>
> Q. **Does the transcript which was afforded to them as a Rule 26.2 statement accurately reflect the matters contained in the tape which you made of your interview with him?**
>
> A. **Yes, sir.**
>
> Q. Nothing further.

(Docket Entry No. 21, Addendum No. 12 at pp. 76-77) (emphasis added).

The state post-conviction record includes a transcript of the taped interview of Rice, but the actual tape of that interview was not produced. The state appellate court found that "Rice's entire statement was tape recorded and transcribed." Yet, the actual transcript version of the Rice taped interview is incomplete and lacks a clear ending.

> Q. What time, okay they [Irwin and Sims] got there, they [Irwin and Sims] got there between 1:00 and 1:30?
>
> A. Uh huh. 12:30 to 1:30, something like that.

13

Q. 12:30 to 1:30. What time did he leave your house?

A. I am going to say that it was between, it had to be between 2:30 and 3:30, somewhere in that line. You have got to understand, you know, hell after.

Q. Where were they going after they [Irwin and Sims] left your home?

A. To get a motel room. That is.

Q. Did he make any comments about the girl or anything?

A. Yea, you know, he made the comment that he was, you know, trying to get her in bed and you know, just back and forth, back and forth, you know, among, between themselves, but yet, it was to where you could overhear their conversation. He didn't make a big secret about it.

Q. The only thing that you noticed about her as strange was that she just acted wired or.

A. The strangest thing is when she pulled that daggum gun out and put it on the table I guess, or on the bar.

Q. Did she ever tell you why she had that gun?

A. She never did say. I was, I never personally saw the gun. Nichole was telling me about it later. Well, when she come back in the bathroom, or when she come into the bathroom, she said, "That damn girl got a gun out there, a loaded gun." She said, "We need to get them out of here." I said, "Well hell, calm down." I said, "What do you mean a loaded gun." And she said, "A 357, she has got a gun."

Q. Have you seen him anymore since today?

A. No sir. The last time I seen him was when he left my house.

14

Q.    Around 3:00 or 3:00.

A.    Yes sir.  Between 2:30 and 3:30.

Q.    Did uh, have you tried to make contact with him anytime today?

A.    No sir.

MR. O'REAR:    Were you suppose to?

A:    Yea, he was suppose to call me around 9:00 or 9:30 to ask me about the car, about the cadillac that I have got.

MR. BURGESS:    When he left your house, he was headed to get him a motel.

A.    He was in fine shape, real fine shape.  He was intoxicated.

Q.    What kind of car was he driving?

A.    Uh, it is a light blue Oldsmobile.  I think that is what it was.

Q.    Anything else that you know that you can tell us?

A.    No, other than.

Q.    Was he down there to see anybody else that you know?  Does he know anybody else in that neighborhood?

A.    Not down in my neighborhood but since you said, Silver Point.  Do you want this in there?

Q.    Yes.

A.    I am.  That old boy, what is his name down there that is dealing down there pretty heavy?  Un, no. Uh.  Damn.  He turned Biggon on to him.  I know you know him.

Q.    Skip.  Do they call [him] Skip?

A.    No. Uh, what is his last name.

15

(Docket Entry No. 21, Addendum No. 12 at pp. 41-43). The transcript of Rice's interview ends abruptly without O'Rear's closing remarks as to the time and date that is on his other witness interview transcripts in this case. See *e.g.*, Docket Entry No. 21, Addendum No. 1 at p. 22 and Addendum No. 4 at p. 769, Attachment thereto at p. 10. Rice's <u>Miranda</u> waiver reflects that the interview was on January 13, 1995 at 7:14 p.m. (Docket Entry No. 21, Addendum No. 11 at p. 44). The transcript reflects the interview was on January 13, 1995 at 9:10 p.m. at the Putnam County Justice Center. <u>Id.</u> at p. 38. The officers on the Rice interview were O'Rear, Doug Burgess and David Andrews.[4]

As stated earlier, Rice was subpoenaed for trial, but did not appear. <u>Robinson</u>, 2003 WL 22888916 at **2-4. In his affidavit for the state post-conviction proceeding, Rice described "two taped statements" that he gave to investigating agents about the Irwin murder. Rice's affidavit reads as follows:

> 2. **I gave Putnam County Sheriff Detective DOUG BURGESS, Detective Lynch and T.B.I. Agent O'REAR two (2) taped statements to some events that I had personal knowledge of in the case of <u>State of Tennessee vs. Donald L. Robinson, Jr.</u>, Putnam County Criminal Court No. 95-0139, prior to the trial in that matter;**

> 3. **That I was present when the victim called David Robinson, Jr. on that same evening in question;**

> 4. **When they interviewed me, prior to trial, I told him that I heard the victim, GERALD IRWIN, make the statement that he was going to kill somebody, if**

---

[4]See also Petitioner's Exhibit 6.

**he did not have his money, on the night in question, and this was in all two (2) taped interviews;**

5. That KIM SIMS was present during the conversation between myself and the victim, GERALD IRWIN, when he stated he was going to kill somebody on that date, if he did not pay him;

6. I was never called as a witness by the State or Defense Counsel, even though I gave the taped statements to the three Investigating Officers.

(Docket Entry No. 21, Addendum No. 11 at p. 37) (emphasis added). By the time of the State post-conviction hearing, Rice had died.

### 4. Sims as a Paid State Informant

Petitioner's proof is that Sims was a paid State informant and that the State failed to disclose this fact at Petitioner's trial and in his state post-conviction proceeding. Sims was involved in several drug deals, including with two State witnesses at Petitioner's trial. These drug deals were in the same judicial district, with one drug deal prior to Petitioner's trial and second deal shortly after Petitioner's trial. Gerald Irwin was shot in January 1995, and Petitioner's trial was from February 12 through 16, 1996.

Petitioner's proof includes the testimony of Jeffrey Guth, Sparta's Chief of Police, that between February 1995 and February 1996, Kim Sims worked as a confidential informant ("CI") for the Sparta Police Department at least seven different times. (Docket Entry No. 100, September 30, 2008 Transcript ("TR.") at pp. 9-13). Sims worked under the code name "Cherry." Id. at p. 10. There are contemporaneous records of the Sparta Police Department's payments to Sims for her work as an informant. Petitioner's Exhibit No. 1 (pay logs) and

Petitioner's Exhibit No. 3 (signed pay receipts). The drug cases in Guth's department are prosecuted by the District Attorney for the Thirteenth Judicial District whose office prosecuted Petitioner. TR. at p. 17. The Sparta Police Department is not a member of the district's joint drug task force, but does request the Task Force's assistance and provides informants to the Task Force. Id. at p. 19. In Guth's view, the members of the Task Force would have known Sims was an informant for cases where the Sparta police department provided her as an informant. Id. at p. 20. For the Robinson trial, the District Attorney General's office did not ask Guth about Sims. Id. at p. 18.

Steve Randall, Director of the 13th Judicial District's Joint Drug Task Force testified that he heard other Task Force officers talk of their use of Sims, under code name "Cherry," as a confidential informant. Id. at pp. 25-27. Randall heard the talk about Sims in a conference room in which the Task Force's local officers shared information with the TBI. Id. at p. 26. Randall identified four men as the sources of talk about Sims as a confidential informant: Roach, a deputy Sheriff for Putnam County, Butch Morris and Milton Bowling, TBI Agents; as well as another agent, Alan Selby, who "worked mainly with TBI people." Id. at p. 27. The proof reflects that Selby worked for the White County Sheriff's Department in January 1996. Petitioner's Exhibit 4.

At the September 30th evidentiary hearing in this action, Sims testified that in 1995 and 1996, she initially denied that she worked as a paid confidential informant for the Sparta Police Department, the Putnam County Sheriff's Office, and the Tennessee Bureau of Investigation ("TBI"). Id. at pp. 41-42. Sims later admitted that she gave information about David Watkins and Thomas Prine to Putnam County law enforcement officers during the 1995-96 time frame.

Id. at p. 49-51. Sims initially admitted and then denied providing drug deal information on a David Mabe. Id. at p. 51. For the Watkins information, Putnam County paid Sims "[p]robably a hundred dollars." Id. at p. 51. Yet, Sims could not remember having the code name "Cherry." Id. at pp. 41-46. Sims testified: "I was on drugs. Like I said, I don't remember anything about any of this right here." Id. at p. 47. Sims testified she did not know Roach or Morris. Id. at pp. 51-52.

Sims's confidential informant work included two state witnesses at Petitioner's trial, Deborah Irwin, the victim's wife and Wade McClure. Prior to Petitioner's trial, Sims purchased drugs from Wade McClure, Gerald Irwin's "long-time friend." (Docket Entry No. 100, Transcript at pp. 32 and 45). See also Docket Entry No. 21, Addenda Nos. 3b and 3c McClure testimony at pp. 280-313. On January 25, 1996, before Petitioner's trial, Sims implicated McClure while working as a confidential informant for Putnam County and the TBI. Id. at pp. 32-33. See also Petitioner's Exhibit 4, McClure Indictment and Petitioner's Exhibit 5, Morris Memorandum. McClure had known Sims a long time as a family friend. Id. at pp. 32 and 45. McClure identified Sims as the intermediary in that buy. Id. at p. 35. At the September 30th hearing, McClure testified that Sims was an intermediary for two white men who made a controlled buy of cocaine from McClure in Sparta on January 25, 1996, about three weeks before Robinson's trial. Id. at pp. 32-35. Sims could not remember making the purchase from McClure, but stopped short of affirmatively denying the purchase. Id. at pp. 45-47. McClure was charged for this offense on September 10, 1996 and was arrested in March 1997. Id. at pp. 35, 37.

The indictment and investigation memorandum on McClure's January 25th's drug transaction reflects a confidential informant. Petitioner's Exhibit No. 4, McClure Indictment;

Petitioner's Exhibit No. 5, Morris Memo. The two white officers with whom Sims worked are Butch Morris, a TBI Agent, and Gary Roach, a deputy sheriff for Putnam County. (Docket Entry No. 100, Transcript at pp. 55-56). Roach could not remember any particulars about his role in the McClure drug buy, but confirmed that "around that time" he and TBI Agent Morris "used a young black female in the Sparta area" to make illegal drug buys. Id. at pp. 57, 58.

As to Deborah Irwin, shortly after Petitioner's trial, on February 17, 1996 Sims implicated Deborah Irwin in an illegal drug deal. Petitioner's Exhibit No. 1 at p. 1 and Petitioner's Exhibit No. 2. See Docket Entry No. 21, Addendum No. 3d, Deborah Irwin, Trial Testimony at pp. 489-98. Sims's drug transaction with Deborah Irwin resulted in the search of Deborah Irwin's home and the discovery of guns and crack cocaine. This arrest occurred on February 17, 1996, id. at pp. 10-13, two days after the conclusion of Petitioner's trial. Sims had known Deborah Irwin for a long time. Id. at p. 47. Yet, Sims testified at the September 30th hearing that she could not remember Deborah Irwin. Id. at pp. 41-46, 48.

The District Attorney for the 13th Judicial District has jurisdiction that includes Putnam County, White County, Cookeville, and Sparta. This District Attorney also serves on the board of directors of the District's Joint Drug Task Force. Id. at pp. 23-24. That office prosecuted Petitioner with assistance of the Putnam County Sheriff's Office and the TBI. (Docket Entry No. 21, Addendum No. 3a, David Andrews, Trial Transcript at pp. 60-81; Burgess, Trial Transcript at pp. 81-98 and O'Rear, Trial Transcript at pp. 98-237. The Sparta Police Department is within the District Attorney's jurisdiction and cooperates with the District Attorney's Drug Task Force in essentially all of Sparta's cases or when requested. (Docket Entry No. 100, Transcript, Guth at p. 17; Randall, TR. at pp. 23-24 and 30-31). The Sparta Police department did not work on

20

Petitioner's prosecution.

Eric Christiansen, an assistant district attorney general from the Third Judicial District, was appointed District Attorney General pro tem to prosecute Petitioner, as Petitioner's father was at that time a local law enforcement officer. Id. at pp. 70-71. Christiansen had the same authority as the District Attorney for the 13th Judicial District. Id. at pp. 72-74. Christiansen did not discuss Petitioner's case with the then District Attorney and could not recall if he asked any assistant in that office about confidential drug informants. Id. at p. 75. For Petitioner's trial, Christiansen testified that he continued his practice of an open file policy. Id. at p. 76. At the state post-conviction hearing, Petitioner's trial counsel testified that he relied on that open file policy in accepting the state's discovery production. (Docket Entry No. 21, Addendum No. 12 at pp. 13, 38).

In his state post-conviction petition, Petitioner alleged that Sims was a paid state informant. Id. at Addendum No. 11 at p. 18. Yet, that proceeding did not disclose that Sims was a paid informant. Christiansen, who also represented the State in the Petitioner's post-conviction proceeding, did not make any such inquiry about Sims even after Petitioner's allegations that he believed Sims was a paid State informant in his state post-conviction petition. (Docket Entry No. 199, Transcript at pp. 75-76). Respondent concedes that the prosecution failed to disclose Sims's status to defense counsel, and that the State's counsel remained ignorant of her informant status until this federal habeas litigation. (Docket Entry No. 91, Respondent's Response to Petitioner's Statement of Facts at ¶¶ 79 and 88).

### B. Conclusions of Law

### 1. Petitioner's Exhausted Claims

Petitioner's claim about the state trial court's ruling that restricted his trial counsel's cross-examination of Jacqueline Langford is a clearly exhausted claim. In his direct appeal, Petitioner argued that the trial court abused its discretion under Tennessee Rule of Evidence 611(b) and deprived Petitioner of his "right" to effective cross-examination that was a "constitutional error of the first magnitude and amount[ed] to a violation of the basic right to a fair trial." (Docket Entry 21, Addendum No. 6 at p. 7). Petitioner cited inter alia, State v. Hill, 598 S.W.2d 815 (Tenn. Ct. Crim. App. 1980), that relied upon the Supreme Court's decision in Davis v. Alaska, 415 U.S. 308 (1974), holding that the denial of a defendant's effective cross-examination is a "constitutional error of the first magnitude." Hill, 598 S.W.2d at 819 (quoting Davis, 415 U.S. at 318). The Tennessee Court of Criminal Appeals agreed that the trial judge "erred in unduly limiting counsel's examination of the witness," but held the error to be harmless beyond a reasonable doubt. State v. Robinson, 1999 WL 61062 at *3. The Tennessee appellate court did not set forth its rationale for that conclusion.

As a threshold matter, the Court concludes that this claim was fairly presented to the state courts where Petitioner provided the "citation of [a] case that might have alerted the court to the alleged federal nature of the claim." Baldwin v. Reese, 541 U.S. 27, 33 (2004). A federal constitutional claim is "fairly presented" to the state court where "the petitioner relied upon state cases employing the federal constitutional analysis in question." Blackmon v. Booker, 394 F.3d 399, 400 (6th Cir. 2004). Because in his direct appeal, Petitioner cited the state court decision Hill that relied on Davis, the Court considers this claim exhausted.

This claim is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Lindh v. Murphy, 521 U.S. 320, 336 (1997). Under the AEDPA,

federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding, unless that state court proceeding:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362, 413 (2000), the Supreme Court stated that a state court judgment is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court on a set of materially indistinguishable facts." In such instances, the Supreme Court held that a federal habeas court may grant a writ. Id. The Supreme Court interpreted the language "clearly established Federal law, as determined by the Supreme Court of the United States" as referring to "holdings as opposed to dicta" of its decisions at the time of the state court decision. Id. at 412. Moreover, the relevant analysis is "to apply a rule of law that was clearly established at the time the Petitioner's state court conviction became final." Id. at 390; accord Joshua v. DeWitt, 341 F.3d 430, 436 (6th Cir. 2003). In Bell v. Cone, 535 U.S. 685, 693 (2002), the Court reiterated that AEDPA modified a federal court's role in reviewing state prisoner applications "in order to prevent federal habeas 'retrials' and to ensure that state court convictions are given effect to the extent possible under the law."

Under the "unreasonable application" clause, the Supreme Court stated that a state court judgment results in an "unreasonable application" of clearly established federal law "if the state

court correctly identifies the governing legal principle from [the Supreme Court's] decision but unreasonably applies [that principle] to the facts of the particular case." Id. at 694. The district court "must presume that all determinations of factual issues made by the state court are correct unless the defendant can rebut that presumption by clear and convincing evidence." Mitchell v. Mason, 325 F.3d 732, 737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)).

### A. Petitioner's Sixth Amendment Claims

Jacqueline Langford, Petitioner's girlfriend, testified as a State witness and on direct examination, when asked about statements made by Deloris Smith, Petitioner's co-defendant, Langford responded: "I thought [Smith] said that [Robinson] was supposed to kill [Sims] too. I'm not sure; I thought that's what [Smith] said." (Docket Entry No. 21, Addendum No. 3d at p. 520). Petitioner's contention is that this testimony suggested that Smith and Robinson had planned to murder Irwin and Sims. Petitioner notes that Smith, his co-defendant, did not testify at their trial.

On his cross-examination of Langford, Petitioner's counsel asked Langford about Smith's statement: "You think that's what she said. Could [Smith] have said [Robinson] could have killed them both?" Id. at p. 532. The trial court sustained an objection to this question and cut-off this aspect of Langford's cross- examination. Petitioner's trial counsel earlier secured an admission from Langford about Smith's statement when Langford stated: "I think that's what she [Smith] said." Id. Petitioner cites Langford's post-trial affidavit in which Langford states that if she had been asked to explain her testimony, she would have testified that she did not remember what Smith's "exact words were, if she said he might, could have or may have killed Gerald Irwin **or he had to kill Gerald**." (Docket Entry No. 21, Addendum 1 at pp. 129-31) (the

24

emboldened portion is the handwritten addition to the affidavit).

For habeas relief, under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993), a constitutional error must pose a "substantial and injurious effect or influence in determining the jury's verdict." <u>Accord</u> <u>Fry v. Pliler</u>, 127 S.Ct. 2321, 2328 (2007). Petitioner is not "require[d] to show that the error was outcome-determinative, but instead places the risk of doubt upon the State." <u>Gray v. Moore</u>, 520 F.3d 616, 625 (6th Cir. 2008). Thus, "whether a violation of an accused's confrontation rights affected the jury's verdict, the proper inquiry is not whether [the violation] negatively affected that particular witness' testimony, but instead whether the record as a whole supports the verdict irrespective of that testimony." <u>Id.</u> at 627. Thus, an "assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." <u>Id.</u> (internal quotations omitted).

A method to assess whether the trial court's ruling was harmless is to consider the effect of the absence of Langford's testimony at Petitioner's trial. <u>Gray</u>, 520 F.3d at 627 Petitioner contends that without Langford's testimony, the State had to prove that Robinson did not shoot Irwin out of a sudden unreasonable fear, but did so with deliberation and premeditation. To be "deliberate," the murder must be committed with "time to reflect," "cool purpose," and "a lack of impulse." <u>Tennessee v. Brown</u>, 836 S.W.2d 530, 540 (Tenn. 1992) (internal quotations removed). The "deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait." <u>Id.</u> at p. 539 (internal quotations removed). Tennessee Courts cannot instruct jurors that premeditation

25

may be formed in an instant. Id. at p. 543.

In evaluating this claim, Petitioner argues that the effect of the limited cross-examination of Langford must be viewed in light of the State's proof, for which Langford was the key corroborative witness of Sims. As the Tennessee appellate court stated: "Although certain details were corroborated by a number of other witnesses, **the State's theory was established principally by Kim Sims**, the only eyewitness to the crime. Sims testified that she did not see the victim reach for his gun, and although she had been with the victim several hours that night, she never heard him threaten Robinson." Robinson, 1999 WL 61062 at *1, 2 (emphasis added).

Petitioner contends that the credibility of Sims's testimony was contradicted by her earlier false statements about the Irwin murder, the testimony of the Super 8 motel clerk who testified contrary to Sims that Sims's mobile telephone was operational at the motel, and Sims's admitted drug use, including on the night of the murder. In this factual setting, Petitioner argues Langford's cited testimony is critical in that her statement corroborates Sims's testimony that Petitioner was acting with premeditation. With Sims's credibility seriously challenged and Smith's decision not to testify, Petitioner contends that Langford's testimony was critical to convict Petitioner. Given that Langford is the mother of Petitioner's children, testified as a State witness, and gave her highly incriminating inference or understanding about Smith's statement, the Court agrees that Langford was a critical State witness. This is a difficult issue because as discussed infra, Sims's status as a paid confidential informant for the State was not disclosed at the Petitioner's trial or other state court proceedings.

From the Court's review of the trial record, Petitioner's counsel was able to elicit from Langford that she did not know exactly what Smith said and on cross-examination Langford's

26

testimony was "I think that's what she said." To be sure, defense counsel sought unsuccessfully to elicit from Langford an alternate version of Smith's statement. In her post trial affidavit, Langford asserts that "she did not get to explain that she did not remember what Deloris Smith exact words were, if she said he might, could have or may kill Gerald Irwin **or he had to kill Gerald**." (Docket Entry No. 21, Addendum No. 1 at p. 129) (the emboldened portion is the handwritten addition to the affidavit).

Given Langford's apparent ambiguity and the Petitioner's counsel need to cross examine this key witness, the Tennessee appellate court could reasonably conclude that the trial court erred in restricting counsel's cross-examination of Langford. Yet, with Langford's admission on cross-examination that she was unsure of Smith's exact words, the Court concludes that this claim does not render the Tennessee appellate court's ruling of harmless error so unreasonable so as to set aside Petitioner's conviction.

### 2. Petitioner's Defaulted Claims

Petitioner acknowledges that his two Brady claims are procedurally defaulted, but contends that his proof satisfies the elements of cause and prejudice necessary to excuse those defaults and that such a showing also establishes these Brady claims as meriting habeas relief. Given his concession of procedural defaults on his Brady claims, Petitioner bears the burden to show cause for these procedural defaults and actual prejudice, or that the failure to consider the claim will result in a miscarriage of justice by the conviction of one who is actually innocent. Proof of a Brady violation can establish cause and prejudice as well as prove a substantive Brady violation. Banks v. Dretke, 540 U.S. 668, 691-92 (2004).

Petitioner contends that the Putnam County Sheriff's Office and TBI whose officers

prosecuted Petitioner, had actual knowledge that Sims was a confidential informant because their agents are on the district's judicial drug task force that used and discussed Sims's work as a confidential informant before Petitioner's trial. Moreover, Petitioner asserts that prior to Petitioner's trial, the District Attorney pro tem knew or should have discovered and known of Sims's work as a paid State informant for the Sparta Police Department, the Putnam County Sheriff's Office or the TBI. The District Attorney pro tem possessed the authority to obtain that information from any law-enforcement agency in his assigned jurisdiction, including the Sparta Police Department.

Petitioner also contends that given that the murder at issue arose over a drug debt, and Sims's role as a key state witness and her use of cocaine, including on the night before the murder, a reasonable prosecutor or lead agent would have made pretrial inquiries about Sims to understand fully the extent of her drug activity. These inquiries would have revealed her informant work with the Sparta Police Department, TBI, and the Putnam County Sheriff's Department that are within the prosecutor's judicial district. Petitioner notes that Christiansen, the prosecutor inquired about and disclosed Sims's abortion of Petitioner's child.

Respondent contends, in sum, that if Christiansen, the prosecutor, lacked actual knowledge of Sims's status as a paid informant, then the State cannot be held responsible under Brady for suppressing that information. The Respondent also contends that the state courts reasonably determined that the TBI agent had only one interview with Rice and that even if Rice's affidavit about his second interview with the TBI agent were true, the state courts reasonably credited the TBI agent's testimony.

In reply, Petitioner argues that assuming Christiansen lacked actual knowledge of Sims's

28

status, the State's argument fails because <u>Brady</u> and its progeny impute knowledge to the prosecutor of exculpatory and impeachment evidence that is actually known only to police officers and law enforcement officers who work on the case or in that judicial district.

In <u>Brady</u>, the Supreme Court held that the government is required to disclose to the defendant evidence in its possession that is both favorable to the accused and material to guilt or punishment. "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In <u>United States v. Bagley,</u> 473 U.S. 667, 676 (1985), the Supreme Court extended <u>Brady</u>: "Impeachment evidence, however, as well as exculpatory evidence, falls within the <u>Brady</u> rule."

In <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), the Supreme Court reiterated that <u>Brady</u> materials require disclosure of impeachment evidence, without a request from the defendant.

> [In <u>Bagley</u>], the Court disavowed any difference between exculpatory and impeachment evidence for <u>Brady</u> purposes, and it abandoned the distinction between the second and third <u>Agurs</u> circumstances, i.e., the "specific-request" and "general- or no-request" situations. <u>Bagley</u> held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

<u>Id.</u> at 433 (quoting <u>Bagley</u>, 473 U.S. at 682, 685).

Later, the Supreme Court restated the elements of a <u>Brady</u> violation. "There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."

29

Strickler v. Greene, 527 U.S. 263, 281-82 (1999). In sum, for his Brady claim, Petitioner must

show: "(1) that the evidence was favorable to him; (2) that it was suppressed (whether

intentionally or not); and (3) that prejudice ensued." Jamison v. Collins, 291 F.3d 380, 385 (6th

Cir. 2002).

Brady's disclosure duty extends to exculpatory or impeachment evidence that is known

only to investigating agents or officers assigned to the prosecution team. As the Supreme Court

stated in Kyles:

> **The State of Louisiana** would prefer an even more lenient rule. It pleads that
> some of the favorable evidence in issue here was not disclosed even to the
> prosecutor until after trial, Brief for Respondent 25, 27, 30, 31, and it **suggested**
> **below that it should not be held accountable under Bagley and Brady for**
> **evidence known only to police investigators and not to the prosecutor. [FN]**
>
>> [FN] **The State's counsel retreated from this**
>> **suggestion at oral argument, conceding that the**
>> **State is "held to a disclosure standard based on**
>> **what all State officers at the time knew." Tr. Of**
>> **Oral Arg. 40.**
>
> **To accommodate the State in this manner would, however, amount to a**
> **serious change of course from the Brady line of cases. In the State's favor it**
> **may be said that no one doubts that police investigators sometimes fail to**
> **inform a prosecutor of all they know. But neither is there any serious doubt**
> **that 'procedures and regulations can be established to carry [the**
> **prosecutor's] burden and to insure communication of all relevant**
> **information on each case to every lawyer who deals with it'.**

514 U.S. at 438 (quoting Giglio v. United States, 405 U.S. 150, 154 (1972)) (emphasis added).

In Strickler, the Supreme Court again reiterated that "the [Brady] rule encompasses

evidence 'known only to police investigators and not the prosecutor.' In order to comply with

Brady, therefore, **'the individual prosecutor has a duty to learn of any favorable evidence**

**known to the others acting on the government's behalf in this case, including the police.'"**

527 U.S. at 280-81 (quoting Kyles, 514 U.S. at 437, 438) (emphasis added). This duty is based upon "the special role played by the American prosecutor in the search for truth in criminal trials." Id. at 281.

From the Court's review of the record, as the Tennessee Court of Criminal Appeals found: "Although certain details were corroborated by a number of other witnesses, **the State's theory was established principally by Kim Sims, the only eyewitness to the crime**. Sims testified that she did not see the victim reach for his gun, and although she had been with the victim several hours that night, she never heard him threaten Robinson." Robinson, 1999 WL 61062 at *2 (emphasis added). Sims's role as a paid State witness clearly establishes her bias, and could affect the jury's assessment on these two critical factual issues, if her credibility were meaningfully challenged. Given the importance of her testimony and her credibility on the events prior to, at and after the murder, a reasonable prosecutor would have inquired of fellow prosecutors and local agents about Sims. Significantly, the Supreme Court expressly stated in Kyles, that the prosecutor could establish procedures to uncover any Brady material known to local law enforcement officers that would be exculpatory or impeachment evidence. This inquiry would appear more compelling, given that Christiansen was from another judicial district. As Petitioner noted, Christiansen performed some inquiry about Sims, as reflected in his questions at trial on direct examination of Sims about her drug use and her abortion of Petitioner's child. (Docket Entry No. 21, Addendum 3c at pp. 324, 325-26).

Other facts exist here that would have caused the State prosecutor and the lead case agent(s) to obtain as much information about Sims as available to them. This murder arose over an unpaid drug debt. The victim was a drug dealer. Petitioner owed the victim money for drugs.

31

Sims was present at the prior meeting of Petitioner and victim and at the murder scene. Sims used drugs at a house shortly before the murder. Given her testimony on the sequence of events, Sims's credibility was crucial to the State's case. Another State witness, Wade McClure, was involved in illegal drug buys set up by Sims on January 25, 1996, shortly before Petitioner's trial that began on February 12th. Christiansen should have inquired with local law-enforcement colleagues, including the Sparta Police Department, to investigate Sims's and McClure's background, (especially Sims, because her credibility was central to the State's case). In addition, Sims worked as an informant with Morris, a TBI agent, and Roach, a deputy Sheriff for Putnam County on the McClure drug arrest. Moreover, before Petitioner's trial, McClure had an outstanding illegal drug deal with Sims as the informant. The significant contacts between these two key state witnesses and case agents shortly before Petitioner's trial create a clear basis for prosecutorial inquiry.

As a matter of law, "the individual prosecutor has a duty to learn of any favorable evidence known to others acting on behalf of the government's behalf in the case, including the police." Kyles, 514 U.S. at 437. As to the scope of the prosecutor's duty under Kyles, the Supreme Court expressly rejected the State's suggestion that its Brady obligations were limited to what the police investigators knew: "The State ... suggests it should not be held accountable under Bagley and Brady for evidence **known only to police investigators** and not to the prosecutor. To accommodate the State in this manner would, however, amount to a serious change of course from the Brady line of cases." 514 U.S. at 438 (emphasis added and footnote omitted). In the omitted footnote, the Supreme Court stated that "The State's counsel retreated from this suggestion at oral argument, conceding that the State is 'held to a disclosure standard

based on what all State officers at the time knew.'" Id. at n 11 (citation omitted). This language extends the prosecutor's Brady duty of disclosures to law enforcement officers within the prosecutor's district.

In these circumstances, the Court concludes that compelling factual circumstances existed that imposed a legal duty upon Christensen and/or O'Rear as the lead case agent to discover and/or disclose Sims's status as a paid State informant. At a minimum, Petitioner's proof establishes the absence of **any** effort or procedures to uncover this clearly exculpatory evidence about Sims, the primary State witness. In Kyles, the Supreme Court stated that, "neither is there any serious doubt that 'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it.'" 514 U.S. at 438 (quoting Giglio, 405 U.S. at 154). The absence of such procedures required by Kyles in April 1995, more than nine months prior to Petitioner's trial, reflects an avoidance of the prosecutor's constitutional obligations under Brady and Kyles.

The Court concludes that Petitioner has established cause for any procedural default as well as the threshold element of his Brady claim, namely the prosecutor's breach of his disclosure duties under Kyles. The Court further concludes that the threshold Brady requirement is satisfied because the impeachment evidence of Sims's role as a State paid agent was suppressed and was "favorable" to Robinson. Jamison, 291 F.3d at 385. The next issue here is the prejudice to Petitioner by this non-disclosure.

As to whether the non-disclosure of this impeachment evidence about Sims's paid informant status satisfies the materiality element under Brady to warrant habeas relief, Kyles underscored several factors to be considered:

33

Four aspects of materiality under Bagley bear emphasis. Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). ... The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." Bagley, 473 U.S., at 678.

The second aspect of Bagley materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

Third, ... once a reviewing court applying Bagley has found constitutional error there is no need for further harmless-error review. Assuming, arguendo, that a harmless-error enquiry were to apply, a Bagley error could not be treated as harmless, since "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," 473 U.S., at 682 (opinion of Blackmun, J.).... In sum, once there has been Bagley error as claimed in this case, it cannot subsequently be found harmless under Brecht.

The fourth and final aspect of Bagley materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item. As Justice Blackmun emphasized in the portion of his opinion written for the Court, 473 U.S., at 675, 105 S.Ct., at 3380 and n. 7. We have never held that the Constitution demands an open file policy (however such a policy might work out in practice), and the rule in Bagley (and, hence, in Brady) requires less of the prosecution than the ABA Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate. ...

While the definition of Bagley materiality in terms of the cumulative effect of suppression must accordingly be seen as leaving the government with a degree of discretion, it must also be understood as imposing a corresponding burden. On

34

the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a Brady violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, see Brady, 373 U.S., at 87, 83 S.Ct., at 1196-1197), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

Id. at 434-38 (emphasis added).

In sum, to warrant federal habeas relief on a Brady claim, the issue is "whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict based upon a . . . reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.'" Strickler, 527 U.S. at 289, 290 (quoting Kyles, 514 U.S. at 434).

In addition, to excuse his procedural default, Petitioner must also prove that he was "actually prejudiced by the alleged constitutional error." Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986). The Supreme Court conceded that it has not given "precise context" to the term "prejudice," and the term has not been defined, "expressly leaving to future cases further elaboration of the significance of that term." United States v. Frady, 456 U.S. 152, 168 (1982) (quoting Wainwright, 433 U.S. at 91).

The Supreme Court addressed the legal and factual significance of the State prosecutor's nondisclosure of a confidential state informant.

The jury, moreover, did not benefit from customary, truth-promoting precautions that generally accompany the testimony of informants. **This Court has long**

35

**recognized the "serious questions of credibility" informers pose.** On Lee v.
United States, 343 U.S. 747, 757, 72 S.Ct. 967, 96 L.Ed. 1270 (1952). See also
Trott, Words of Warning for Prosecutors Using Criminals as Witnesses, 47
Hastings L.J. 1381, 1385 (1996) (**"Jurors suspect [informants'] motives from
the moment they hear about them in a case, and they frequently disregard
their testimony altogether as highly untrustworthy and unreliable ...."). We
have therefore allowed defendants "broad latitude to probe [informants']
credibility by cross-examination" and have counseled submission of the
credibility issue to the jury "with careful instructions."** On Lee, 343 U.S., at
757, 72 S.Ct. 967; accord Hoffa v. United States, 385 U.S. 293, 311-312, 87 S.Ct.
408, 17 L.Ed.2d 374 (1966). See also 1A K. O'Malley, J. Grenig, & W. Lee,
Federal Jury Practice and Instructions, Criminal § 15.02 (5th ed.2000) (jury
instructions from the First, Fifth, Sixth, Seventh, Eighth, Ninth, and Eleventh
Circuits on special caution appropriate in assessing informant testimony).

Banks, 540 U.S. at 701-02.

To be sure, Sims's work as a paid State informant was after the fatal shooting, but one of

her cases involved Wade McClure, a State witness at Petitioner's trial, and that drug deal

occurred before Petitioner's trial. Petitioner argues that Sims's informant status at trial was

critical impeachment evidence that "would have made it reasonable for the jury to infer that the

authorities were giving her 'work' and cash during that period because they wanted to keep her

on the prosecution's side. The recent and recurrent payments from the local authorities also may

have explained to the jury why Sims testified at the preliminary hearing that immediately after

the shot, Robinson was 'just staring' (as might a man just coming to grips with a violent act of

self-defense) whereas at the trial she testified that Robinson was immediately smiling (as might a

man who just accomplished something he set out to do)". (Docket Entry No. 104, Petitioner's

Post-Hearing Brief at pp 14-15).

The state record does reflect that at Petitioner's preliminary hearing in the state court,

Sims testified as follows about Petitioner's reaction immediately after the shooting:

Q. Can you describe how David Robinson looked when you turned around in your seat?

A. He just stared at me. **He didn't look any certain way**. He just stared at me.

(Docket Entry No. 53, Attachment thereto, Transcript at p. 16) (emphasis added). At trial, Sims's testimony on this same issue was as follows:

Q. Did you look back at David Lee Robinson, Jr.?

A. Yes.

Q. What did you see?

A. I saw a gun.

**Q. Did you see the expression on his face?**

**A. Yes.**

**Q. Can you describe that expression?**

**A. He was smiling**.

(Docket Entry No. 21, Addendum 3c at p. 351) (emphasis added). From the Court's review of the cross-examination of Sims at trial, this material discrepancy was not explored. <u>Id.</u> at Addenda Nos. 3c and 3d at pp. 385-449 and 451-454. Disclosure of Sims's status as a paid State informant in all likelihood would have ensured exploration of this critical discrepancy about Petitioner's reaction to the shooting, that was a material fact on the element of premeditation.

Petitioner's could have made use of the information that Sims worked as a confidential informant for local law enforcement agencies between the Irwin's shooting and his trial. Robinson could have presented proof that those agencies had paid Sims several times for her cooperation and that Sims's work on criminal investigations and arrests implicated at least one other State witnesses at Petitioner's trial, Wade McClure. With this latter information,

Petitioner's counsel could have impeached Sims by showing her bias as a paid agent of the State and in the discrepancy in her testimony about the events prior to the murder and the specifics of the murder, including her completely different description about Petitioner's reaction to the shooting. As the state appellate court found, Sims was the State's primary witness.

The Respondent contends that Sims's status is immaterial, in that the victim was holding a sandwich in his hand at the time of the shooting and the victim's mouth contained food with the inference that the victim was eating at the time the Petitioner shot him, eliminating any possible self-defense. (Docket Entry No. 90, Respondent's Memorandum, at p. 9) (citing Sims's testimony at Docket Entry No. 21, Addendum No. 3c at p. 415). The autopsy report, however, does not reflect that the victim had food in his mouth at the time of his death. (Docket Entry No. 21, Addendum No. 4 at Exhibit 68). The medical examiner agreed with the prosecutor's statement of the State's proof that the victim ate a pork sandwich "within a couple of hours of the time of his death." Id. at Addendum No. 3d at p. 472. Petitioner testified at his trial that the victim was not eating a sandwich at the time of the shooting. Id. at 652. Proof about the victim eating a sandwich when he was shot came from Sims whose credibility is at issue and whose testimony on this point is contradicted by the prosecutor's description of the State's proof and the autopsy report. Yet, Sims testified that she does not know whether the victim removed the sandwich that was nearest to the gun that the victim placed on the console between the driver's seat and the victim's seat. Id. at 406, 451. The State's investigation found the sandwich at issue on the floor of the victim's vehicle. Id. at p. 452.

Given the Supreme Court's comments about an informant in <u>Banks</u>, <u>supra</u> at pp. 35-36

, the Court concludes that the State's non-disclosure of Sims's informant status is a material nondisclosure. As a matter of law, under <u>Brady</u>, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . . .The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. . . ." <u>Kyles</u>, 514 U.S. at 434. Moreover, if a <u>Bagley</u> violation is found, there is not any need for harmless-error review, as in <u>Kyles</u>, the Supreme Court stated: "In sum, once there has been <u>Bagley</u> error as claimed in this case, it cannot subsequently be found harmless under <u>Brecht</u>." <u>Id.</u> at 436. <u>Bagley</u> involved nondisclosure of impeachment evidence of a federal agency's payments to private security guards who were witnesses against a defendant, but the federal agency signed after the defendant's trial. 473 U.S. at 670, 671. The Court concludes that as a matter of law, the <u>Bagley</u> violation here involving the non-disclosure of Sims as a paid State informant, was material and was not harmless. Thus, this <u>Bagley</u> violation establishes the Petitioner's lack of a fair trial.

As to the <u>Brady</u> claim involving Rice, the trial testimony of O'Rear shows that James Rice, an initial suspect, was interviewed once at Rice's residence and then at the Sheriff's Department and was determined not to be involved in the murder. (Docket Entry No. 21, Addenda Nos. 3a and 3b, pp. 138-142, 218-219). Although the state trial record establishes two interviews of Rice, the trial and post-conviction records both establish the existence of only one taped interview of Rice. <u>Supra</u> at pp. 12-13. Under these circumstances, the Court cannot find the state court's ruling on Petitioner's <u>Brady</u> claim about Rice to be unreasonable.

For the above stated reasons, the Court concludes that the petition for the writ of habeas corpus should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the 23nd of January, 2009.

WILLIAM J. HAYNES, JR.
United States District Judge